### BAYS *v.* WARREN FEATHERBONE CO.

1. INJURY TO SERVANT—ASSUMPTION OF RISK.

Plaintiff, an adult employé, was injured while operating a hoisting apparatus consisting in part of a wheel turned by an endless rope, which was kept in place on the wheel by V-shaped pieces of wood. Some of these pieces had split off of the wheel, and the injury was occasioned by the rope running off. *Held*, that the danger of the rope running off the wheel if not kept in line, and the defect therein, were so apparent that plaintiff should be deemed to have assumed the risk.

2. SAME—WEIGHT OF EVIDENCE—NEW TRIAL.

Where, in an action for injuries received in operating a hoisting apparatus, plaintiff testified that he had never operated it before, but on cross-examination he showed a familiarity with it hardly consistent with the statement, and nine other witnesses testified that they had seen him operate it, a verdict for plaintiff was so contrary to the weight of the evidence that a new trial should have been granted.

Error to Berrien; Coolidge, J. Submitted April 23, 1902. (Docket No. 52.) Decided June 24, 1902.

Case by John T. Bays against the Warren Featherbone Company for personal injuries. From a judgment for plaintiff, defendant brings error. Reversed.

*W. G. Howard* and *Gore & Harvey*, for appellant.

*G. M. Valentine* and *M. L. Howell*, for appellee.

HOOKER, C. J. The plaintiff recovered a verdict of $11,000 for injuries alleged to have been suffered while in defendant's employ. In the third story of defendant's warehouse there was an apparatus for hoisting and lowering boxes of material. It consisted of a wooden wheel, four or five feet in diameter, whose axis was a shaft which turned with the wheel upon bearings. This shaft extended through the gable of the building, and upon the outside there was a drum, eight inches in diameter, upon which a rope was wound, which served to raise the load. By turning the wheel inside, the rope was unwound from or wound upon the drum. The inner wheel was turned by an endless rope about two inches in diameter, which ran upon the face or edge of the wheel, which was about eight inches wide. Blocks two inches by four, with V-shaped notches cut in the center, were nailed upon the face of the wheel at intervals of about seven inches, and the rope was expected to run in these notches. There was testimony tending to show that some of the two by four pieces had split off. Below the drum and opposite the wheel, in the gable, was a door, through which the box to be lowered was ejected. The plaintiff testified that he found it necessary to push the box out of the door, and that while doing so with one hand, while he held the endless rope with the other, the box got away, and he was violently jerked, and he afterwards found, "when he came to," that the rope was off from the wheel. He was unable to explain how it was done, and the only theory upon which the jerk can

be explained, under the evidence, consistent with his statement that he had hold of the endless rope, is that, in pushing the box out, he pulled the rope out of line with the wheel, and did not hold the rope tight, but allowed the wheel to turn, thereby running the rope off from the wheel, as would necessarily be the case. Unless we can say this, there is nothing to indicate how or why the accident occurred.

Assuming that the accident happened in the way mentioned, the questions in the case are: (1) Was defendant negligent in maintaining the wheel in a condition which would permit the rope to run off when pulled out of line, and not warning the plaintiff? (2) Did the plaintiff assume the risk?

This wheel was a simple affair. From the description, and a model which was before us, it appeared that its alleged defects were visible to any one operating it who should take the trouble to look. It had been operated for years without serious results, although the rope would come off occasionally when pulled out of line and the weight simultaneously lowered. The V-shaped blocks were designed to aid in keeping the rope in place, and their purpose was obvious. If broken off, as some of them were, it was apparent that there would be less to keep the rope in place. It is common knowledge that, by pushing a rope or belt out of line with its pulley, it will run off; so common that to presume that one who has worked about machinery does not know it, would not be justified. This man was an adult, and had worked about the shop of defendant for a long time. He was at the time a sort of a foreman, and a part of his duty was to fix the belts in the shop. We are of the opinion that he was as well able to judge of the necessity for keeping the rope in line as his employer was, and that he must have known that a failure to do so would be attended with danger that the rope would get off from the wheel, and that, if it can be said that the wheel was unsafe, it should also be said that the defect was apparent and the risk assumed.

The testimony shows that this plaintiff had used that wheel many times. If he had, he knew all about it as a matter of fact. He admitted that he had worked for this company "off and on" for twelve years. Harmon testified that he had seen him hoist boxes by that apparatus. Holden had seen him doing it frequently for two and a half years. Salters had been up there with him when he operated it, and had seen him at the warehouse often. Carlyle said he had helped him many times; or, as he stated it, "lots of times." Warren said that he had often seen him do it when he (plaintiff) was drayman for defendant. Gahler says he helped him hoist a number of times. Trowbridge had seen it many times. Gelow and Lampke each saw him raise and lower goods many times. As against this rather overwhelming evidence there is the testimony of the plaintiff that he never operated the wheel before, though his cross-examination indicates a familiarity with the method of doing the business hardly consistent with the statement. If, as claimed, his testimony gave him the right to go to the jury with the question, the weight of evidence was so overwhelming against him as to satisfy us that a new trial should have been granted. Upon the proofs in the case, a verdict of $11,000 was unconscionable.

The judgment is reversed, and a new trial ordered.

MOORE, GRANT, and MONTGOMERY, JJ., concurred. LONG, J., did not sit.